# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIR HEKMATI,<br>7203 Pebble Park Dr.<br>West Bloomfield, MI 48322<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>U.S. VICTIMS OF STATE SPONSORED<br>TERRORISM FUND<br>c/o Mary Patrice Brown, Special Master<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>KENNETH FEINBERG<br>1455 Pennsylvania Avenue, NW<br>Suite 390<br>Washington, DC 20004<br><br>SPECIAL MASTER MARY PATRICE<br>BROWN<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>       Defendants. | **COMPLAINT**<br><br><br><br>Case No. 23-cv-3774 |

Plaintiff Amir Hekmati, for his Complaint against Defendants the United States

Department of Justice, the U.S. Victims of State Sponsored Terrorism Fund, Kenneth Feinberg,

and Special Master Mary Patrice Brown, respectfully alleges as follows:

## NATURE OF THE ACTION

    1.    Amir Hekmati is a decorated former Marine who served his country for a decade

in and out of uniform in Iraq and Afghanistan.  In 2011, while visiting his dying grandmother in Iran, he was arrested by Iranian officials, who falsely claimed that he was a CIA spy.  He was imprisoned, brutally tortured, and sentenced to death by hanging.  In January 2016, Mr. Hekmati was released after four-and-a-half years of wrongful imprisonment as part of the Iran nuclear deal.  Since that time, Mr. Hekmati has sought to rebuild his life and overcome the continuing trauma of his experience in Iran.  In May 2016, Mr. Hekmati sued the Iranian government for its acts and obtained a $63.5 million default judgment.  Based on that judgment, he timely applied for compensation from Defendant the U.S. Victims of State Sponsored Terrorism Fund (the "Fund") which was established to compensate U.S. victims of torture abroad.  Under the Fund's statute, Mr. Hekmati's eligibility for an award from the Fund is determined solely by whether he holds a final judgment issued by a United States district court against a state sponsor of terrorism arising from an act of international terrorism.  It is uncontroverted that Mr. Hekmati holds such a judgment.

2.     The Fund awarded Mr. Hekmati $20 million based on his fulfillment of its requirements for compensation.  But the Fund never paid Mr. Hekmati.  When Mr. Hekmati's counsel informed the Fund that he would have to take legal action if the Fund did not pay, the Fund abruptly informed Mr. Hekmati that it had decided to "reconsider" his eligibility.  The Fund then revoked Mr. Hekmati's eligibility based on false, anonymous, hearsay allegations that Mr. Hekmati had gone to Iran not to visit his grandmother, but rather to sell U.S. secrets to the Iranian regime.  In doing so, the Fund denied Mr. Hekmati the fundamental right to confront his accusers, in violation of his right to due process under the Constitution.

3.     Mr. Hekmati brings this action against Defendants under the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 702–706.

4.      The Fifth Amendment provides that, "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend V.

5.      The APA provides that, in agency hearings, "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."  5 U.S.C. § 556(d).

6.      Furthermore, the APA authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions," including those found to be "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(B).

7.      This action arises from Defendants' failure to (a) provide Mr. Hekmati with constitutionally sufficient procedures for deciding his claim and (b) adjudicate his claim in accordance with those procedures.

8.      Mr. Hekmati seeks a declaratory judgment under the APA that the process used to reconsider Mr. Hekmati's eligibility violated the Fifth Amendment.  Mr. Hekmati asks this Court to hold Defendants' actions unlawful and to require Defendants to re-assess his claim using procedures that accord with the Due Process Clause of the U.S. Constitution.  In particular, Mr. Hekmati seeks a new hearing with proper procedures consistent with the Constitution, including the opportunity to see the evidence against him and confront and cross-examine his accusers.

9.      Mr. Hekmati also seeks attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## THE PARTIES

10.      Plaintiff Amir Hekmati is a U.S. citizen and a resident of Michigan.

3

11.     Defendant the Department of Justice is a federal executive department of the United States.

12.     The Fund is part of the Department of Justice.  It was established by the United States Congress to "provide compensation to certain U.S. persons who were injured in acts of international state-sponsored terrorism."[1]

13.     Defendant Kenneth Feinberg is sued on account of his acts while acting as Special Master of the Fund.  Mr. Feinberg served as Special Master of the Fund from May 2016 to March 2019, and was later re-retained by DOJ in a limited capacity to reconsider Mr. Hekmati's claim. He is sued in his official capacity.

14.     Defendant Mary Patrice Brown is the current Special Master of the Fund.  She is sued in her official capacity.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under the APA, 5 U.S.C. § 702, which provides that, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review," and 28 U.S.C. § 1331, which gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

16.     Venue in this Court is proper because, upon information and belief, a substantial part of the events giving rise to the claim occurred within the District of Columbia.  *See* 28 U.S.C.A. § 1391(e)(1).

17.     This Court has jurisdiction to award attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

---

[1] *United States Victims of State Sponsored Terrorism Fund*, U.S. Dep't. of Just. (Aug. 11, 2023), https://www.justice.gov/criminal/criminal-mlars/usvsst.

## FACTUAL BACKGROUND

I.    **Events Giving Rise to Mr. Hekmati's Award from the USVSST Fund**

18.    Amir Hekmati was born in Flagstaff, Arizona, in 1983.  His parents are naturalized U.S. citizens who emigrated from Iran to the United States in 1979.  His father, who died in the fall of 2020 after a long battle with brain cancer, had a Ph.D. in Microbiology and was a college professor until his retirement.  His mother is an accountant.  Along with his three siblings, Mr. Hekmati grew up in Flint, Michigan.  He graduated with honors from Monterey Peninsula College as an Arabic Linguist and magna cum laude from the University of Michigan with a Bachelor of Science in Economics.

### A.    Mr. Hekmati's Service to the United States

19.    After graduating with honors, Mr. Hekmati chose to serve his country.  He served in the U.S. Marine Corps from 2001 to 2005 as an infantry rifleman and translator.  Sergeant Hekmati completed two lengthy tours of duty in Iraq in the 2nd Battalion, 4th Marine Regiment, a unit that suffered one of the highest casualty rates in the Marines.  He left the Marines a decorated combat veteran, having received the Good Conduct Medal, Global War on Terror Service Medal, Sea Service Deployment Ribbon, Global War On Terrorism Expeditionary Medal, National Defense Service Medal, and a Combat Action Ribbon.

20.    After his exemplary military service, Mr. Hekmati continued to give back to his country, this time as a military contractor.  From 2005 to 2011, he focused on Farsi translation and cultural education.  He did well in various roles, and even patented his own instructional methodology for languages that was later purchased by Vcom3D, a defense contractor based in Orlando, Florida.

21.     In 2011, Mr. Hekmati began looking at opportunities (including by submitting applications to various master's programs) outside the intelligence realm, which would allow him to return home and focus more on his family.

22.     This coincided with Mr. Hekmati's desire—encouraged by his family—to visit his ailing grandmother in Iran.  Mr. Hekmati corresponded with a law firm specializing in Iranian-American travel to Iran during the same period about getting all necessary visas and travel documents in order to make the trip.

23.     At the same time, Mr. Hekmati heard from a co-worker about a position with Six3 Systems ("Six3"), another government contractor, for active intelligence work in Afghanistan. The co-worker recommended that Mr. Hekmati apply, and Mr. Hekmati was put in touch with a Six3 recruiter.

24.     On its face, the job appeared to be an incredible opportunity.  Mr. Hekmati viewed Afghanistan as the epicenter of active intelligence work at the time; positions there were coveted. The role, as described in the recruiter's e-mail, was for an "Intelligence Analyst" providing support on a broad range of topics concerning "Afghanistan measures of stability."  Such a role could provide Mr. Hekmati with another opportunity to use his skillset to serve his country, and also could allow him to gain valuable work experience, learn from more senior analysts, and make professional connections.  The offer was hard to refuse.

25.     Mr. Hekmati knew, however, that the job would come at a cost.  The position would take him far away from his family and his girlfriend.  It could delay his plans to go to graduate school.  Mr. Hekmati did not know where in Afghanistan he would be placed or precisely the type of projects he would be working on, but he knew from experience that the days would be long, and that many such jobs were in remote areas and could feel very isolating.  After much discussion

with his family and girlfriend, he decided to give the position a try.  If it was not everything it had

been marketed to be, he would leave.

26.     Soon after arriving in Afghanistan, Mr. Hekmati knew the job was not what he had

hoped it would be.  He had no project team or mentor.  He struggled to find his role in the unit.

He was given only one official assignment, which was to deliver a weekly report on anti-U.S.

propaganda by the Taliban, the Haqqani network, and Al-Qaeda.  Beyond that, he received little

guidance on how to fill the 12-hour shifts that were required by his contract.  He felt pressure from

his superiors to be proactive, not reactive.

27.     It appeared to Mr. Hekmati that each analyst had built a specialty in a few specific

areas.  Separate from his weekly reports on cultural messaging, Mr. Hekmati sought to identify

and build an area of expertise where he could add value.  Unprompted by his supervisors, he

generated a report on the benefits and feasibility of using local Afghani residents to form a

protective force for multinational corporations building cellphone towers throughout dangerous

areas of Afghanistan.  Supervisors praised his work.  Mr. Hekmati observed that the daily

intelligence summaries he received via email each morning included repeated references to Iranian

influence in Afghanistan, Iranian financing and support of the Taliban and Haqqani networks, and

Iranian attempts to smuggle weapons into Afghanistan for use against U.S. forces.  Mr. Hekmati

determined that, given his Iranian background, knowledge of cultural issues, work experience

(including at BAE Systems over the previous year as a contractor to the U.S. military concerning

Iranian influence in Iraq), and fluency in Farsi, he could establish a role for himself as an expert

in Iranian influence in Afghanistan, particularly focused on the threat posed to U.S. troops.  He

asked other analysts if this focus seemed useful, and they agreed.  He searched the intelligence

platforms for data relating to Iran to educate himself further on these issues and identify any potentially useful leads that might be valuable to his unit.

28.    Mr. Hekmati had clearance to review all the Iran-related materials that he accessed. Mr. Hekmati conducted his searches via Intelink, which is akin to Google for classified information.  Search results would include a mix of classified and unclassified information, and would display only documents to which he had access rights.  He also clicked on links that were emailed to him as part of the above-referenced daily digest.  He had no way of accessing information that had not been previously authorized by his supervisors for him to see.

29.    Mr. Hekmati's activities were fully accessible by his colleagues.  He sat in a room crowded with other analysts, and his superiors often circulated around the room, checking in on various analysts' activities.  Mr. Hekmati recalls discussing his Iran focus openly with colleagues and superiors.  Not once was Mr. Hekmati cautioned, reprimanded, or asked to stop his research. A letter of recommendation provided by a former colleague specifically notes that Mr. Hekmati worked on Iran-related issues while at Six3.

30.    Despite positive feedback on his work product and his efforts to build a specialty in Iran-related issues, Mr. Hekmati was unhappy in the job.  He had expected structure, direction, collaboration, and support, but received none.  He had given the position a chance, but it was not worth delaying his other life plans or being away from his family and loved ones for yet another extended period.  He gave his two weeks' notice only a month or two after arriving.

**B.    Mr. Hekmati's Visit to Iran**

31.    While Mr. Hekmati was in Afghanistan, his mother, sister, and brother had been visiting family in Iran.  They encountered no issues during their visit.  Mr. Hekmati knew he would have little time to make a trip after starting school.  He already was in Afghanistan, which borders Iran.  Mr. Hekmati's mother had been urging him for several years to visit his grandmother who

8

lives in Iran, and he decided to make the visit before returning home to Michigan.  On August 14, 2011, he flew to Iran via Dubai, and planned on staying for a few weeks.

32.    Mr. Hekmati had no safety concerns about visiting Iran.  His mother and siblings had just taken a trip there without incident, and he would be staying with family the entire time. No one ever offered any reason why he should not go to Iran.

33.    Mr. Hekmati obtained authorization to travel to Iran from the Iranian Interests Section of the Pakistani Embassy in Washington, D.C., with the assistance of a U.S. law firm specializing in Iranian-American travel to Iran.  He was open about his U.S. military service during the application process, and was assured by officials at the Iranian Interests Section that his military past would not cause any issues for him during his trip.  Service in a foreign military for a dual national like Mr. Hekmati is not illegal under Iranian law.

### 1.    Mr. Hekmati's Illegal Arrest, Imprisonment, and Torture by Iranian Authorities

34.    On August 29, 2011, two days before his scheduled return to the United States, he was arrested and imprisoned without warning by Iranian officials as he was getting ready to attend a family holiday celebration.  Interrogators accused him of spying for the United States, and took him to the notoriously brutal Evin Prison, where he remained until January 17, 2016.

35.    During Mr. Hekmati's four-and-a-half years in captivity, he suffered prolonged and continuous physical abuse at the hands of the Iranian Government.  He was whipped on the bottom of his feet, struck by an electrical Taser to his kidney area, forced to stay in stress positions for hours at a time, and hit with batons.  Prison guards threw water on his cell floor to prevent him from sleeping.  A bright light was kept on 24 hours per day to invoke sensory deprivation. Mr. Hekmati's captors forced him to take lithium and other addictive pills, and then would stop

giving him the pills to invoke withdrawal symptoms.  He was denied proper medical care, and suffered severe malnutrition.

36.    Mr. Hekmati also suffered extreme and continuous psychological torture.  He was placed in solitary confinement for 17 months in a 1.5-meter-by-1-meter cell.  He was permitted to leave his cell for only 20 minutes every three days, and even then, it was only to take a freezing cold shower.  He was interrogated regularly.  Intelligence officials repeatedly insulted Mr. Hekmati's family and his country.  He was taunted for serving honorably as a U.S. Marine. At one point, he was told that his sister had been involved in a terrible car accident, but that he could not use the phone to call his family unless he confessed that he was a spy for the CIA.

37.    For months, Mr. Hekmati was not permitted to speak with legal counsel or permitted to call or visit with his family, including his father, who was suffering from terminal brain cancer.  He was denied any consular access to the U.S. Interests Section in Iran, in violation of the Vienna Convention on Consular Relations.  He was held for five months without even being charged.

38.    Mr. Hekmati was told that all of these abuses would continue unless he confessed to being a spy.  After months of trauma, in December 2011, Mr. Hekmati's abusers shifted their tactics.  They transported Mr. Hekmati from Evin Prison to Esteghlal Hotel, dressed him in civilian clothes, gave him food and cigarettes, and told him he would be released immediately if he agreed to be interviewed for an internal training video for the Iranian Intelligence Ministry.  As part of the interview, Mr. Hekmati's captors demanded that he state that he worked for the CIA. Mr. Hekmati initially refused.  His interrogators told him he would be returned to solitary confinement if he did not comply.  Mr. Hekmati, having suffered months of physical and psychological abuse, ultimately complied in hopes of being released and reunited with his family,

10

as his abusers had promised.  But Iran did not release Mr. Hekmati.  Instead, his captors broadcast the "confession" on Iranian state television as "proof" of Mr. Hekmati's "crimes," and then returned him to solitary confinement.

39.     In January 2012—five months after Mr. Hekmati's arrest and imprisonment— Iran's Revolutionary Court held a 15-minute trial behind closed doors on Mr. Hekmati's "crimes." Mr. Hekmati was convicted of "espionage, waging war against God, and corrupting the earth," and sentenced to death.  He spent several months on death row, thinking that every day would be the day of his execution.  He later received a new "trial," and his sentence was commuted to ten years' imprisonment, though he knew that the courts could reinstate his death sentence at will.

40.     After nearly an additional year in solitary confinement, Mr. Hekmati was moved to a new prison ward where the prisoners consisted largely of drug dealers and hardened criminals. Conditions there were even more brutal.  The ward had no heat or warm water.  His cell was infested with rats, which he had to kill himself using a broomstick.  His skin was eaten by lice, fleas, and bed bugs.  He suffered from recurring lung infections and constant stomach problems due to malnutrition.  His health problems were exacerbated when he went on a hunger strike.  He continued to suffer regular physical and psychological abuse of the nature described above.

41.     Mr. Hekmati endured this trauma for four-and-a-half years, never knowing if or when he would be released and reunited with his family.

42.     Mr. Hekmati's wrongful detention and torture caused an international uproar.  In August 2013, the United Nations Working Group on Arbitrary Detention found Mr. Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human Rights and the

International Covenant on Civil and Political Rights.[2]  Numerous Congressmen and U.S. Secretary

of State John Kerry decried Iran's wrongful detention of Mr. Hekmati, and made repeated calls for

his release.[3]  Academic experts have testified that Mr. Hekmati's imprisonment was akin to

hostage-taking and consistent with a pattern and practice of imprisoning Iranian-Americans to use

as bargaining chips against the United States.[4]

### 2.    Mr. Hekmati's Release

43.    On January 17, 2016, Mr. Hekmati was released from prison as part of a prisoner

trade between Iran and the United States made at the same time as the Iran nuclear deal.

44.    Mr. Hekmati returned to the United States forever changed.  He has suffered severe

psychological trauma, including post-traumatic stress disorder ("PTSD"), as well as financial

---

[2] *See* U.N. Human Rights Council, Amir Nema Hekmati v. Islamic Republic of Iran, Working Group on Arbitrary Detention, Opinion No. 28/2013, U.N. Doc. A/HRC/WGAD/2013/28 (2014), Univ. of Minn. Hum. Rts. Libr. (Aug. 29, 2013), http://hrlibrary.umn.edu/wgad/28-2013.html (finding Mr. Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights).

[3] Letter from Richard Blumenthal, U.S. Senate, to John Kerry, Sec'y of State, U.S. Dep't. of State (Jan. 5, 2015), https://www.blumenthal.senate.gov/imo/media/doc/Blumenthal%20Letter%20to%20Kerry%20r e%20Hekmati.pdf; Brownie Marie, *Three Americans still held prison in Iran, Rep. Smith calls for justice*, Christian Today (June 20, 2014, 4:00 PM EST), https://www.christiantoday.com/article/three.americans.prisoner.iran.rep.smith.calls.justice/3829 3.htm; Congressman Dan Kildee, *Congressman Dan Kildee's Veterans Day Message on Amir Hekmati*, Youtube (Nov. 11, 2015), https://www.youtube.com/watch?app=desktop&v=aFsidnQYLSw.

[4] *See* Expert Rep. of Dr. Mehdi Khalaji, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (D.D.C. Feb. 6, 2017), ECF No. 12-7; *see also* Rick Gladstone, *Jason Rezaian Trial in Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html (quoting a former diplomat involved in negotiations to free Americans in Iran as saying "it was possible [Iran] did not want to resolve the prisoner issue because it was part of a negotiating strategy"); Indira A.R. Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*, Bloomberg News (May 15, 2015, 6:19 PM), https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-missing-americans-hangs-over-iran-talks.

hardship arising from the loss of more than four years of income and the master's degree he was intending to pursue.

## II.     FBI Interviews Following Mr. Hekmati's Release

45.     Shortly after Mr. Hekmati's release, in the midst of his ongoing trauma such as PTSD, he was subjected to two unannounced interrogations by the FBI without the assistance of counsel.

46.     The first interview occurred immediately upon Mr. Hekmati's release from prison, after he was flown from Iran to a U.S. air base in Landstuhl, Germany.  Rather than releasing Mr. Hekmati promptly to his family, who had flown to Landstuhl to meet him, the Government held Mr. Hekmati at a segregated medical facility.  Mr. Hekmati and his family were told that this was "routine" and that he was being given medical exams.

47.     While he was at this facility, two men interviewed Mr. Hekmati.  The questioning initially began with the agents showing Mr. Hekmati pictures of other Americans missing or imprisoned in Iran and asking if he had seen or heard anything about these Americans while in prison, then shifted focus to Mr. Hekmati's work in Afghanistan.  Mr. Hekmati was in a severe state of shock and suffering from the effects of his PTSD.  He was confused, annoyed, and numb with exhaustion.  His family was sick with worry over his unexplained prolonged detention for purportedly routine medical exams.  Mr. Hekmati's lawyer called Secretary of State John Kerry's Chief of Staff, Jonathan Finer, and threatened legal action.  Mr. Finer was extremely apologetic. Mr. Hekmati was permitted to leave promptly thereafter.

48.     A second FBI interview occurred shortly after Mr. Hekmati's return to Michigan, in April 2016.  Agents came to his parents' home unannounced.  Mr. Hekmati recalls being asked to accompany them to an FBI field office to look at more pictures because they "needed more help with an investigation."

49.     Over his counsel's objection, the FBI proceeded to interview Mr. Hekmati.

**III.    Mr. Hekmati's Suit Against the Government of Iran**

50.     On May 9, 2016, Mr. Hekmati sued the government of Iran in the U.S. District Court for the District of Columbia, alleging that his detention and treatment by the Iranian government constituted torture and hostage-taking under the Foreign Sovereign Immunities Act. Iran did not answer, and Mr. Hekmati moved for a default judgment.  In support of his motion, he submitted a declaration—made under penalty of perjury—detailing his background, his experience in Iran, and the physical, psychological, and financial damages he had suffered as a result of his imprisonment and torture.  He also submitted testimony from family members, records of his military honors, letters of recommendation from employers in the national security realm, public news reports of his imprisonment and death sentence, public statements of outrage from international human rights organizations and U.S. government officials regarding his imprisonment, a report from an academic expert regarding Iran's pattern and practice of imprisoning U.S.-Iranian citizens to use as negotiating leverage, and detailed expert reports regarding the ongoing psychological trauma he has suffered as a result of his imprisonment.

51.     As part of his declaration to the Court, Mr. Hekmati stated:

52.     "My parents had been encouraging me for many years to visit my relatives [in Iran] and to see the country of my parents' birth.  My mother had been encouraging me in particular over the last few months to visit my grandmother in Iran if I had the chance, as her health had begun deteriorating.  Given that I would be starting school and likely would not have time to go to Iran in the foreseeable future, I decided it was an opportune time to make the trip.  I flew to Iran via Dubai and planned on staying for a few weeks."

Decl. of Amir Hekmati ¶ 25, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (D.D.C. Feb. 10, 2017), ECF No. 14-1.

53.     As part of its findings of fact, the Court noted that, "[b]efore returning to the United States [from Afghanistan], [Mr. Hekmati] decided he would take his first trip to Iran to visit relatives and see the country of his parents' birth."  Mem. Op. at 2, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (D.D.C. Sept. 29, 2017), ECF No. 16.

54.     On September 29, 2017, U.S. District Court Judge Ellen Huvelle awarded Mr. Hekmati a default judgment in the amount of $63,496,358, consisting of "(1) $16,020,000 in compensatory damages for pre-release pain and suffering; (2) $10,000,000 in compensatory damages for post-release pain and suffering; (3) $5,728,179 in economic damages; and (4) $31,748,179 in punitive damages."  Order & Default J., *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (D.D.C. Sept. 29, 2017), ECF No. 15.

## IV.     The USVSST Fund

55.     Congress established the Fund in 2015 via the Act, 34 U.S.C. § 20144 (formerly codified as 42 U.S.C. § 10609).  In doing so, Congress created a due process right to compensation for eligible individuals, and established a system for determining eligibility and challenging denial of eligibility decisions.

56.     The express purpose of the Fund is to "provide compensation to individuals who were injured as a result of an international act of terrorism by a state sponsor of terrorism."[5]

57.     Congress appropriated $1.025 billion for the Fund for fiscal year 2017, and mandated that the DOJ deposit certain forfeiture proceeds, penalties, and fines from civil and criminal matters involving prohibited transactions with state sponsors of terrorism in the Fund during its life.[6]

---

[5] *See* Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45535-02 (U.S. Dep't of Just. July 8, 2016).
[6] Justice for United States Victims of State Sponsored Terrorism Act ("USVSST Act"), 34 U.S.C. § 20144(e).

58.    Under the Act, to qualify for distribution from the Fund, claimants must provide proof of a final judgment issued by a United States court awarding compensatory damages against a state sponsor of terrorism for actions, such as torture or hostage-taking, within 90 days of obtaining the judgment.

59.    The Act provides that all decisions by the Special Master are "final," and provides that "a claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master pursuant to procedures established by the Special Master." 34 U.S.C. § 20144(b)(3)–(4).

**V.    The Special Master's Duties to Administer the USVSST Fund**

60.    The Fund's authorizing statute dictates that the Special Master "shall administer the compensation program . . . for United States persons who are victims of state sponsored terrorism." *Id.* § 20144(b)(1)(A)(iii).  The Special Master's duties include "order[ing] payment from the Fund for each eligible claim of a United States person."  *Id.* § 20144(d)(1).

61.    On May 17, 2016, the Attorney General appointed Defendant Kenneth R. Feinberg as the Special Master to administer the Fund with the assistance of the Money Laundering and Asset Recovery Section of the Criminal Division of the DOJ ("MLARS").  After Mr. Feinberg's retirement in March 2019, the Attorney General named Deborah L. Connor, MLARS Chief, as interim Special Master.  Defendant Mary Patrice Brown was named Special Master in January 2021, and currently serves as Special Master.

62.    The USVSST Act required the Special Master to authorize an initial round of payments to eligible claimants by December 2016.  *Id.* § 20144(d)(2).  Pending availability of additional funds from DOJ forfeiture proceedings, the USVSST Act further required the Special Master to authorize additional payments on a pro rata basis to eligible claimants by

January 1, 2019, and to authorize additional payments for eligible claims annually thereafter. *Id.* § 20144(d)(4)(A).

63.     The DOJ's website provides that, "[v]ictims and their family members can be assured that their claims will be processed promptly, fairly, and transparently."[7]

## VI.   The USVSST Fund Has Paid Billions of Dollars to Other Claimants

64.     Thus far, the USVSST Fund has awarded three rounds of "rolling payments" to eligible claimants totaling approximately $3.2 billion.

65.     In December 2016, the Special Master authorized a first round of payments totaling more than $1.1 billion to 2,332 eligible claimants who submitted applications between July 14 and December 1, 2016.  The Fund distributed all first-round payments in early 2017.[8]

66.     In December 2018, the Special Master authorized a second round of payments totaling nearly $1.1 billion to 3,085 new claimants who submitted applications between December 2, 2016, and September 14, 2018, as well as first-round claimants who remained eligible.  The Fund began issuing second-round payments on January 2, 2019.[9]

67.     In May 2020, the Special Master authorized a third round of payments totaling nearly $1.1 billion to 7,479 new claimants who submitted applications between September 15, 2018, and February 19, 2020, as well as first- and second-round claimants who remained eligible. Half of this amount ($537.5 million) was allocated to "non-9/11 related claimants," such as

---

[7] *United States Victims of State Sponsored Terrorism Fund*, U.S. Dep't of Just. (Aug. 11, 2023), https://www.justice.gov/criminal-mlars/usvsst.

[8] Press Release, U.S. Dep't of Just. Office of Pub. Affs., Department of Justice Compensates Victims of State Sponsored Terrorism (Apr. 6, 2017), https://www.justice.gov/opa/pr/department-justice-compensates-victims-state-sponsored-terrorism; Kenneth R. Feinberg Special Master, *Report Regarding Second Distribution*, U.S. Victims of State Sponsored Terrorism Fund at 8 (Feb. 2019), http://www.usvsst.com/docs/Congressional_Report.pdf.

[9]     *See Important Dates*, U.S. Victims of State Sponsored Terrorism Fund, http://www.usvsst.com/important.php.

Mr. Hekmati.[10]   The Fund issued third-round payments on a rolling basis.[11]   In certain circumstances, claimants are eligible for a "lump sum" payment from the Fund.[12]   The Fund subsequently authorized fourth round payments, and began issuing those on a rolling basis, with "over 90 percent" of payments issued in the first quarter of this year.[13]   As of August 2023, the Fund had paused "additional round[s]" of payments due to "insufficient funds," but will authorize the next round of payments by January 1, 2025, should funds be available.[14]   Under the USVSST Act and subsequent amendments, the Fund will make its last payments no later than January 2, 2030.[15]

## VII.   Mr. Hekmati Fulfilled All Conditions for Payment from the Fund and Holds an Eligible USVSST Claim

68.   Mr. Hekmati's counsel filed a claim with the Fund on his behalf on December 6, 2017, well in advance of the September 14, 2018 deadline for second-round distributions.

69.   In accordance with the Act and the requirements set forth by the Special Master and MLARS, Mr. Hekmati completed a lengthy application, and provided documentation demonstrating that he was a U.S. citizen with an eligible District Court judgment against Iran, a country that was a state sponsor of terrorism for the duration of his confinement and torture.

---

[10] Special Master, *Report Regarding the Third Distribution*, U.S. Victims of State Sponsored Terrorism Fund at 6 (June 2020), http://www.usvsst.com/docs/USVSSTFundCongressionalReport_June2020.pdf.
[11] *U.S. Victims of State Sponsored Terrorism Fund*, U.S. Dep't of Just. (Nov. 14, 2023), http://www.usvsst.com.
[12] *See generally* Triana McNeil & Jason Blair, *U.S. VICTIMS OF STATE SPONSORED TERRORISM FUND: Estimated Lump Sum Catch-Up Payments*, U.S. Gov't Accountability Off. at 16 (Aug. 11, 2021), https://www.gao.gov/assets/gao-21-105306.pdf.
[13] *U.S. Victims of State Sponsored Terrorism Fund*, U.S. Dep't of Just. (Nov. 14, 2023), http://www.usvsst.com.
[14] *Id.*
[15] Special Master, *Report Regarding the Third Distribution*, U.S. Victims of State Sponsored Terrorism Fund at 3 (June 2020), http://www.usvsst.com/docs/USVSSTFundCongressionalReport_June2020.pdf.

Mr. Hekmati also was required to certify, "under oath, subject to penalty of perjury or in a manner that meets the requirements of title 28 U.S.C. § 1746, that the information provided in the Application Form and any documents submitted in support of the claim are true and accurate to the best of my knowledge," and to "agree that any payment made by the Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim."[16]

70.    On December 28, 2017, Special Master Feinberg notified Mr. Hekmati via letter that the USVSST Fund had "determined that [his] claim is eligible" for compensation by the Fund, "in accordance with the requirements of the Justice for U.S. Victims of State Sponsored Terrorism Act."[17]  The letter valued Mr. Hekmati's total eligible claim amount at $31,748,179 (as the Fund does not compensate for punitive damages).  Further, the eligible claim amount was capped at $20,000,000 by the Act's maximum statutory cap.  *See* 34 U.S.C. § 20144(d)(3)(A)(ii).  The letter stated that, "although the USVSST Fund has determined that" Mr. Hekmati's claim was eligible, Mr. Hekmati would be "notified about the exact amount of [his] first payment after the Special Master authorizes the next distribution in January 2019."[18]

71.    On December 13, 2018, the USVSST Fund reiterated to Mr. Hekmati that Special Master Feinberg had "reviewed and approved [his] claim for compensation from the [Fund]."  The letter further noted that Special Master Feinberg had authorized an initial distribution for his claim of $839,100.85.[19]

---

[16]   *See* U.S. Victims of State Sponsored Terrorism Fund Application Form, http://www.usvsst.com/docs/USVSSTFundApplicationForm.pdf.
[17] Collection of letters between U.S. Victims of State Sponsored Terrorism Fund and Counsel at 1 (attached as Ex. 1).
[18] Ex. 1 at 1.
[19] *Id.* at 3.

72. At around this time, Special Master Feinberg reported to Congress that *all* eligible claimants, other than certain creditors who already had received more than 30% of their judgment from other sources, or who were entitled only to conditional payment under the Act based on their participation in pending litigation to enforce their judgments against Iranian property in the United States (neither of which applies to Mr. Hekmati), had received their second-round distributions.

73. Nonetheless, Mr. Hekmati was never paid a penny. Despite many requests from Mr. Hekmati's counsel, as well as inquiries from Members of Congress, the Fund and DOJ refused to provide a timeline for Mr. Hekmati's payment.

## VIII. The DOJ and Special Master "Reconsider" Mr. Hekmati's Award

74. On October 11, 2019, Mr. Hekmati's counsel made a final good-faith attempt to resolve Mr. Hekmati's dispute with the Fund. The letter stated that Mr. Hekmati would be forced to file suit against the Fund and the Special Master if they did not fulfill their obligations to Mr. Hekmati in 15 days.[20]

75. On October 25, 2019—13 days after Defendant's receipt of Mr. Hekmati's October 11 letter—Special Master Connor sent a letter to Mr. Hekmati's counsel stating that the DOJ was "in receipt of your letter dated October 11, 2019," and informing Mr. Hekmati and his counsel that the DOJ "intends to seek reconsideration of the prior eligibility determination and approval of Mr. Hekmati's claim dated December 13, 2018 and, therefore, has suspended any further action on the payment to Mr. Hekmati from the United States Victims of State Sponsored Terrorism Fund."[21] The letter stated that the Fund would be re-hiring retired Special Master Feinberg to re-evaluate the claim. The letter provided no statutory basis for Defendant's reconsideration of Mr. Hekmati's award.

---

[20] *Id.* at 4.
[21] *Id.* at 5.

IX.    **The Violations of Due Process During the Reconsideration and Denial of Mr. Hekmati's Claim**

76.    After three months of virtual silence, on January 15, 2020, Mr. Hekmati's counsel received a letter from Special Master Feinberg formally revoking Mr. Hekmati's Fund eligibility.[22] The letter asserted that a Federal Register Notice setting forth the Fund's application procedures provided the legal basis for the Fund's eligibility reconsideration.  Consistent with the certification required by Mr. Hekmati's application to the Fund, the Notice states that claimants must agree that "payment made by the [USVSST] Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim."[23]

A.    **The Anonymous Hearsay Evidence on Which Defendants Improperly Relied**

77.    In support of the revocation, the letter referenced "attached materials" that summarized anonymous, hearsay allegations from unidentified sources that Mr. Hekmati had no opportunity to confront, cross-examine, or rebut.  These materials included (1) two partially-redacted FBI Form FD-302s containing summaries written by unnamed FBI agents of the two interviews referenced in Section II, above, and (2) a "Record for Special Master," an anonymously written 5-page document that purported to summarize certain statements made by unidentified federal law enforcement officials regarding Mr. Hekmati's supposed activities in the months leading up to his trip to Iran (collectively, the "DOJ Materials").  In a nutshell, the DOJ Materials alleged that:

- In the months leading up to his trip to Iran, Mr. Hekmati sought a job as an intelligence analyst in Afghanistan.

- While in that position, Mr. Hekmati secretly accessed classified materials regarding Iran that purportedly were outside the scope of his job.

---

[22] *Id.* at 6.
[23] *Id.*

- Mr. Hekmati terminated his employment after only a month or two, and failed to notify his former employers about his plans to travel to Iran.

- Mr. Hekmati traveled to Iran using an Iranian passport, purportedly in violation of the terms of his security clearance.

- Four anonymous, but supposedly "reliable," sources stated that Mr. Hekmati approached Iranian government officials offering classified information in exchange for payment.

- Mr. Hekmati demonstrated a "consciousness of guilt" while being interviewed by FBI agents after his release.

78.    On February 12, 2020, Mr. Hekmati's counsel sent Special Master Feinberg a letter stating that his reconsideration of Mr. Hekmati's eligibility was unlawful and, in any event, that his decision was legally and factually unsupportable.  In an effort to resolve the matter promptly and consensually, counsel requested an opportunity to present Mr. Hekmati's views to the Special Master regarding these issues, consistent with 34 U.S.C. § 20144(b)(4), and without waiver of rights, claims, or defenses.[24]

79.    In March and April 2020, Mr. Hekmati provided 379 pages of written evidence and testimony contradicting DOJ's accusations.  Specifically, Mr. Hekmati demonstrated that:

- Email correspondence with his mother and others showed that he had plans to travel to Iran to visit his grandmother long before he learned of the job opportunity in Afghanistan.

- All Iran-related materials he reviewed while in the position were well within the scope of his job responsibilities and his access credentials.  He researched Iran-related issues openly.  A letter of recommendation from his former colleague referenced his work on such issues.

- He was no longer employed at the time he traveled to Iran and, thus, was under no duty to inform his former colleagues about his trip to Iran.

- He was required by Iranian law to use a passport to enter and exit the country.  He procured the passport openly, with the assistance of a U.S.-based law firm specializing in Iranian travel.  His procurement of the

_____

[24] Letter from Scott Gilbert, Gilbert LLP, to Kenneth R. Feinberg, Special Master, U.S. Victims of State Sponsored Terrorism Fund (Feb. 12, 2020) (attached as Ex. 2).

passport did not constitute a violation of his security clearance and, in any event, did not support a logical leap that he sought to sell information to a hostile government.

- He stayed with family during the entirety of his trip to Iran, and did not approach any Iranian government officials about selling information, much less sell them any such information.

- He was imprisoned, tortured, and sentenced to death by the government to which he is alleged to have tried to sell information. Academic experts, international human rights organizations, and our own government have confirmed repeatedly that his imprisonment was politically motivated.

- He took, and passed, two full-scale polygraphs in the years immediately preceding his trip to Iran. He had a steady income from his contracting work, a loving family and girlfriend, and no motive to put his life at risk by selling secrets to a hostile government.

- His purportedly evasive or inconsistent answers when the FBI interrogated him shortly after his release from prison without his lawyer present—twice—were the result of the severe PTSD he was suffering at the time and the shock of being accused of treason and espionage after enduring over four years of imprisonment and torture at the hands of the government to which he supposedly sought to sell information.

**B.    Mr. Hekmati's Objection to the Government's Illegal Use of Anonymous Hearsay Evidence in Violation of His Rights**

80.    On April 7, 2020, Mr. Hekmati participated in an adjudicatory hearing before Special Master Feinberg. In the opening statement to the hearing, counsel for Mr. Hekmati argued that the evidence being utilized was unsound, and that the process was deficient. In particular, counsel contended that:

81.    "The documents that were provided to us with the Special Master's reconsideration decision and upon which it is based, likewise do not contain any facts, any facts that controvert Amir's testimony here or in the district court. Instead, they are based on the recollections of FBI agents who interviewed Amir as soon as he was released from nearly five years of prison and torture in Iran and once again when he returned home to stay with his mother. Neither interview involves sworn testimony and neither interview provided Amir with the basic protections required

23

in such interrogations.  But most importantly here, neither interview adduced any facts . . . that controvert Amir's sworn testimony."[25]

82.    Mr. Hekmati was not afforded the opportunity to cross-examine the alleged government witnesses at the hearing.  He was provided neither their names nor any details regarding their identities or their allegations.  No witnesses were brought in to verify their unsubstantiated allegations.  No explanation was given (or has been given to this day) for the government's failure to provide Mr. Hekmati (or possibly even Defendant Feinberg) this most basic information.

83.    Throughout the process, Mr. Hekmati provided substantial legal precedent demonstrating that DOJ's purported "evidence" was misleading, conclusory, unreliable, and constitutionally infirm.[26]  Mr. Hekmati's counsel specifically objected to absence of due process in the procedures utilized by the USVSST in his case.  Specifically, Mr. Hekmati's counsel noted that the "evidence" purportedly relied upon by Special Master Feinberg was constitutionally deficient, and that the Department of Justice's "case rests entirely on hearsay and unsubstantiated suspicions, primarily in the form of unexplained 'corroboration' by unidentified 'sources."[27] Mr. Hekmati's counsel argued that these "one-sided FBI conclusions cannot be used to prove the truth of any matter asserted, and certainly cannot provide a sufficient factual basis to deprive an individual of a right to payment.  The very purpose of our Constitution is to protect citizens from such lack of due process."[28]

---

[25] Rep.'s Tr. of Videoconference Procs. Before Special Master Kenneth R. Feinberg at 6:24–7:12, U.S. Victims of State Sponsored Terrorism Fund – Hekmati Hr'g (Apr. 7, 2020).
[26] Letter from Scott Gilbert, Gilbert LLP, to Kenneth R. Feinberg, Special Master, U.S. Victims of State Sponsored Terrorism Fund at 10–11 (Nov. 20, 2020) (attached as Ex. 3).
[27] *Id.* at 2.
[28] *Id*. at 2; 10–13.

**C.    Defendants' Affirmation of the Revocation of Mr. Hekmati's Eligibility**

84.    On December 7, 2020, Defendant Special Master Feinberg affirmed the reconsideration and denial of Mr. Hekmati's eligibility via letter, finding "that the Claimant is not eligible to receive payments from the USVSST Fund because his USVSST Fund application contained material omissions and false statements."[29]   In support of the decision, Defendant Feinberg cited the same "evidence" and arguments from DOJ's first submission, without elaboration.   Nor did Defendants, speaking through Special Master Feinberg, address any of the evidence that Mr. Hekmati provided in support of his case, or the lack of evidence supporting the DOJ's contentions.   Mr. Hekmati was not allowed to view the pertinent details of the evidence against him.   For example, Defendants did not provide further details regarding the alleged unnamed accusers whom Mr. Hekmati had no opportunity to confront and cross-examine, or the evidence that Mr. Hekmati was not permitted to see.   Defendants ignored the alleged constitutional and statutory infirmities with the process, even though Mr. Hekmati's counsel explicitly pointed it out during the proceedings.

**D.    Mr. Hekmati's Tucker Act Lawsuit**

85.    Mr. Hekmati sued the United States in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, alleging that the reconsideration and subsequent denial of his claim was not permitted by statute.   The court dismissed for lack of jurisdiction, reasoning in part that, "[t]he relief for [Mr. Hekmati's] claim is an injunction or a declaratory judgment, the types of equitable relief that are, in most cases, beyond the authority of the Court of Federal Claims." *Hekmati v. United States*, 153 Fed. Cl. 800, 808 (2021).   The court stated, however, that his claim "may be within the jurisdiction of a district court under the [APA]."   *Id.*   The Federal Circuit

---

[29] Letter from Kenneth R. Feinberg, Special Master, U.S. Victims of State Sponsored Terrorism Fund, to Scott Gilbert, Gilbert LLP at 2 (Dec. 7, 2020) (attached as Ex. 4).

affirmed in October 2022, holding that it had no jurisdiction under the Tucker Act. *Hekmati v. United States*, 51 F.4th 1066, 1069 (4th Cir. 2022).

## X.    Defendants Violated Mr. Hekmati's Constitutional Rights

86.    The Constitution does not permit the Special Master to deprive Mr. Hekmati of his eligibility under the Act based on unexplained "corroboration" by unidentified "sources" that Mr. Hekmati sought to sell information to the Iranian government.   The Fund's denial of Mr. Hekmati's eligibility without affording Mr. Hekmati an opportunity to confront and cross-examine the witnesses against him violated Mr. Hekmati's rights under the Fifth Amendment.

<u>COUNT I</u>
**(VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT)**

87.    Plaintiff incorporates all the preceding paragraphs by reference, as if fully stated herein.

88.    In denying Mr. Hekmati the opportunity to view the evidence against him and to confront and cross-examine the alleged witnesses against him in an adjudicatory process, Defendants unlawfully deprived Mr. Hekmati of his due process rights under the Fifth Amendment to the United States Constitution.

89.    Mr. Hekmati requests that this Court issue a judgment declaring that the Defendants' denial of Mr. Hekmati's right to confront and cross-examine the witnesses against him violated the Due Process Clause of the Fifth Amendment, and that Mr. Hekmati is entitled to a process that allows him to confront and cross-examine these witnesses and that otherwise complies with the Fifth Amendment.

## COUNT II
## (ACTIONS CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE, OR IMMUNITY UNDER THE ADMINISTRATIVE PROCEDURE ACT

90.     Plaintiff incorporates all the preceding paragraphs by reference, as if fully stated herein.

91.     The APA, 5 U.S.C. § 706, authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions" that are, among other specified categories, "contrary to constitutional right, power, privilege, or immunity."

92.     The APA further provides that, "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."  5 U.S.C. § 556(d).

93.     Defendants' reconsideration process did not allow Mr. Hekmati to view the evidence against him or to confront and cross-examine adverse witnesses, in violation of Mr. Hekmati's constitutional right to due process and the APA.

94.     Mr. Hekmati asks this Court to hold Defendants' actions unlawful and set them aside under the APA.  Mr. Hekmati further asks this Court to declare under 28 U.S.C. § 2201 that (a) Defendants' actions were contrary to Mr. Hekmati's constitutional rights and the APA and that (b) Defendants must adjudicate Mr. Hekmati's eligibility using a process that is consistent with the United States Constitution, the APA, and the Act.

## COUNT III
## (ATTORNEYS' FEES AND COSTS)

95.     Plaintiff incorporates all the preceding paragraphs by reference, as if fully restated herein.

96.     Under the Equal Access to Justice Act, codified as 28 U.S.C. § 2412, the Court "shall award to a prevailing party" in a suit against the United States "fees and other expenses," as

well as costs, unless the Court finds that the position of the United States was "substantially justified or that special circumstances make an award unjust."

97.     Under 28 U.S.C. § 2412(b), "[u]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys," in addition to other costs, "to the prevailing party in any civil action brought . . . against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action."

98.     This action is brought against Defendant United States of America, as well as agencies and departments of the United States of America and individual officials of the United States acting in their official capacities.

99.     Defendants have provided no justification—let alone "substantial justificat[ion]"—for their refusal to fulfill their obligations to Mr. Hekmati.

100.    There are no "special circumstances" to make an award unjust.

101.    Mr. Hekmati requests that this Court issue a judgment awarding him reasonable attorneys' fees under the Equal Access to Justice Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amir Hekmati respectfully requests that this Court:

102.    Accept jurisdiction and venue as proper.

103.    On Count I, issue a judgment declaring that the Defendants' denial of Mr. Hekmati's right to confront and cross-examine the witnesses against him violated the Due Process Clause of the Fifth Amendment, and that Mr. Hekmati is entitled to a process that allows him to confront and cross-examine these witnesses and that otherwise complies with the Fifth Amendment.

104.    On Count II, issue a judgment under the Administrative Procedure Act holding Defendants' actions unlawful and setting aside Defendants' actions under the APA, and further

declaring under 28 U.S.C. § 2201 that, (a) Defendants' actions were contrary to Mr. Hekmati's constitutional rights and the APA, and that (b) Defendants must adjudicate Mr. Hekmati's eligibility using a process that is consistent with the United States Constitution, the APA, and the Act.

105.    On Count III, grant reasonable attorney's fees, expenses, and costs of court pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

106.    Grant such other and further preliminary and permanent declaratory and injunctive relief as is necessary to protect and preserve all of Mr. Hekmati's rights and entitlements under the Constitution, the APA, and the Act; and

107.    Grant all other relief which this Court deems just and proper.

Dated:  December 19, 2023                    GILBERT LLP

                                             */s/ Emily P. Grim*
                                             Emily P. Grim (Bar No. 1006597)
                                             Brandon A. Levey (Bar No. 888314549)
                                             Mark A. Packman (Bar No. 336321)
                                             700 Pennsylvania Ave. SE
                                             Suite 400
                                             Washington, DC 20003
                                             Telephone:  (202) 772-3926
                                             Facsimile:  (202) 772-3333
                                             Email: grime@gilbertlegal.com
                                                    leveyb@gilbertlegal.com
                                                    packmanm@gilbertlegal.com

                                             *Attorneys for Plaintiff Amir Hekmati*